# KOONS v. KANSAS CITY SUBURBAN BELT RAILROAD COMPANY, Appellant.

Division One, December 23, 1903.

1. **Negligence:** FLAGMAN: CONTRIBUTORY NEGLIGENCE: WANTONNESS. ·A flagman at a street crossing was perfectly familiar with the movement of two trains which for two months had been used in removing earth from a pit, the rule being that the train which injured him always began to move across the street as soon as the other came in on the other track. The engine and tender had stopped west of the west line of the street, and just as it was about to move eastwardly, the other train having arrived, a wagon approached seventy or seventy-five feet from the tracks, and the flagman stepped between the rails of the track near the middle of the street to flag it, and was struck by the brakebeam of the backing engine, was carried from forty-eight to seventy feet, the engine at a signal from a bystander was stopped about sixteen feet after the signal was given, and the flagman was removed and immediately died. It was not necessary for him to expose himself to danger or risk his life by stepping on the track, nor had he ever been known to do so before, nor did the engineer see him, nor was the engine unexpectedly started or at an unusual speed. *Held,* that there is no room in the case for the application of the humanitarian doctrine that, notwithstanding the negligent act of deceased in stepping onto the track just as the engine started, the engineer in permitting the train to proceed was guilty of such wanton or willful or reckless disregard of human life as would deny to the defendant the right to plead his contributory negligence as a defense.

2. ———: ———: ———: RINGING BELL: DRAGGING DECEASED AFTER BEING STRUCK. The petition charged that no bell or whistle was sounded as the rules of the company required, and the evidence on these points was conflicting. It was also charged that the flagman was within the "zone of vision" of the engineer from his position in his cab, and that by looking the engineer could have seen deceased in time to have avoided injuring him, and that he knew the peril of deceased after he was knocked down and while he was being dragged and that he could, by the use of ordinary care, have stopped the engine before he was seriously hurt, and that for failing to do so he was guilty of wantonness. There was no evidence that the engineer at any time knew that the flagman was on the track, or that he had been struck and was being dragged, but on the contrary as soon as he was signaled by the ·bystander he stopped the engine

in about sixteen feet, and plaintiff's evidence showed that when the flagman stepped from his usual position of safety onto the track the engine was moving and he could not have been seen by the engineer. *Held,* that there was no wantonness in the case, that the railroad company was not chargeable with the flagman's injuries, and that the case should have been nonsuited.

Appeal from Jackson Circuit Court.—*Hon. James Gibson,* Judge.

REVERSED.

*Lathrop, Morrow, Fox & Moore* for appellant.

(1) The primary duty of plaintiff's husband was to note the approach of trains or engines at the crossing. His violation of this duty was the direct cause of his death and, therefore, there can be no recovery. Coleman's Adm'x v. Railroad (Ky.), 63 S. W. 39; Clark v. Railroad, 128 Mass. 1; Beach on Contributory Negligence, sec. 190; Railroad v. Crawford, 8 So. 243, 89 Ala. 240; Tirrell v. Railroad (Mass.), 62 N. E. 745; Bailey's Law of Personal Injuries Relating to Master and Servant, sec. 1281. (2) Where, as in this case, an employee is injured through a failure to perform his duty, there can be no recovery. Roberts v. Telephone Co. (Mo.), 66 S. W. 155; Nichols v. Glass Co., 126 Mo. 64; Gleason v. Mnfg. Co., 94 Mo. 201; Peppett v. Railroad, 78 N. W. 900; Maes v. Railroad, 23 S. W. 725; Conway v. Railroad (Ia.), 72 N. W. 543; Miller v. Railroad (Mich.), 51 N. W. 370; Stroble v. Railroad, 70 Ia. 555; Railroad v. Bargonier, 119 Ill. 51; Alexander v. Railroad (Ky.), 25 Am. Eng. R. R. Cas.; Railroad v. Carroll, 84 Fed. 772; Erskine v. Beet Sugar Co., 71 Fed. 270; Butte v. Coal Co. (Utah), 47 Pac. 77; Railroad v. Grubb (Ind.), 21 N. E. 460; Railroad v. Dudley (Va), 18 S. E. 274; Anderson v. Telephone Co. (Wash.), 53 Pac. 657; McGorty v. Telephone Co. (Conn.), 38 Atl. 559. (3) There was neither allegation nor proof that the conduct of the servants of

defendant managing the engine was characterized by a willful, wanton or reckless disregard for human life, and there is, therefore, no evidence in the record to support the judgment rendered. · Sharp v. Railroad, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497; Morgan v. Railroad, 60 S. W. 195; Kellny v. Railroad, 101 Mo. 67; Zumault v. Railroad, 74 S. W. 1015; Boyd v. Railroad, 105 Mo. 371; Skipton v. Railroad, 82 Mo. App. 134; White v. Railroad, 85 Mo. App. 411; Van Bach v. Railroad, 71 S. W. 358; Loring v. Railroad, 128 Mo. 349; Railroad v. Pool, 160 U. S. 447; Ferguson v. Railroad (Ia.), 69 N. W. 1026; Martin v. Railroad (Mass.), 56 N. E. 719. (4) Plaintiff's husband, in standing upon the track or so near thereto as to be in the line of danger, voluntarily assumed a dangerous position when he could have performed his duties equally as well by standing where there would be no danger of being struck by a train. Under such circumstances there can be no recovery. Bailey's Personal Injuries Relating to Master and Servant, sec. 1121; Moore v. Railroad, 146 Mo. 572; Hurst v. Railroad, 163 Mo. 311; Railroad v. Bivins, 15 So. 514; Railroad v. Orr, 91 Ala. 548; Railroad v. Holborn, 84 Ala. 133.

*F. F. Rozzelle, F. P. Walsh,* and *John G. Park* for respondent.

(1) Engine 61 started toward the crossing first. This must have misled Koons and made him think engine 61 was about to cross Holmes street. Schmitt testified that he understood from Koons' movements that engine 67 would not move. Schmitt could see engine 67, but none other. Koons, in the performance of his duty, immediately before engine 67 moved, was warning and signaling Schmitt not to drive on the tracks. The act of a flagman or watchman in going into a dangerous place to warn or signal persons not to approach, is not contributory negligence as a matter of

law.    Callahan v. Railroad, 170 Mo. 496; Erickson v.
Railroad, 71 S. W. 1026; 171 Mo. 659; Railroad v. Goss,
72 S. W. 94; Sammon v. Railroad, 62 N. Y. 251; D'Oro
v. Railroad, 13 N. Y. Supp. 789, 129 N. Y. 632. Koons's
first duty was to Schmitt. In saving Schmitt from dan-
ger he is not himself to be accounted careless.    Beach on
Contributory Negligence (3 Ed.), sec. 42.    Besides, his
whole attention was given to his work in hand of sig-
naling Schmitt and seeing that Schmitt understood his
signal.    A servant engrossed in the performance of his
duty to his master may be excusable for a neglect to
note approaching dangers.    Bluedorn v. Railroad, 121
Mo.   267;   Stocks   v.   Railroad,   71   S.   W.   732;
Railroad v. Volk, 151 U. S. 73; Tobey v. Railroad, 94
Iowa 256.    The whole question of whether deceased
was negligent, and, if so, whether his negligence was
the proximate cause of his death, was properly sub-
mitted to the jury in defendant's instructions.    (2)
Koons was doing his duty in signaling Schmitt.    He
was not derelict in any duty which he owed defendant.
Koons owed no duty to defendant to keep out of dan-
ger; he owed that duty to himself.    Otherwise, every
injured employee is injured through breach of duty to
his master and can not recover.    "Machinery cases"
have no applicability to the issues in this case.    In none
of those cases is the "theory of discovered peril" per-
tinent.    (3)    It was the engineer's duty to the general
public and to Koons to look out for persons on the
Holmes street crossing, to anticipate the presence of
persons upon the track at that point, and to exercise
ordinary care in passing over the street. Oates v. Rail-
road, 168 Mo. 544; Stanley v. Railroad, 114 Mo. 619;
Baker v. Railroad, 147 Mo. 156; Kellny v. Railroad,
101 Mo. 77; Sullivan v. Railroad, 117 Mo. 226.    Before
engine 67 started, Koons stood in the south track,
eighteen feet east of the west line of Holmes street.
(Testimony of Schmitt.)    The engine stood ten feet
or more west of Holmes street.    (Testimony of the en-

gineer and the fireman.)    And the engine was twenty-
eight feet or more from deceased. (Testimony of
Schmitt.)   The rear of the engine cut off ten to fifteen
feet of the view. (Testimony of engineer.) That leaves
thirteen to eighteen feet of view unobstructed for the
engineer and fireman to see Koons in his perilous po-
sition before the engine was started.   That brings the
case squarely within the rule that though a person may
be negligent in being upon a railroad track and in a
position of imminent peril, yet if the persons operating
the train know, or, by the exercise of ordinary care,
might know of the other's peril in time to prevent in-
jury, and fail to prevent it, the railroad company is li-
able.   Such a case is one of wanton negligence whereto
contributory negligence is no defense.   Morgan v.
Railroad, 159 Mo. 276; Kellny v. Railroad, 101 Mo. 74.
The doctrine in Missouri from very early times has
been that in such cases the proximate cause of the in-
jury is the failure of the defendant to exercise ordinary
care after the opportunity of the injured party to save
himself has been lost.  Klockenbrink v. Railroad, 72
S. W. 900; Stocks v. Railroad, 71 S. W. 730; Hutchin-
son v. Railroad, 161 Mo. 246; Baird v. Railroad, 146
Mo. 281; Chamberlain v. Railroad, 133 Mo. 587; Lloyd
v. Railroad, 128 Mo. 595; Lynch v. Railroad, 111 Mo.
610; Dahlstrom v. Railroad, 108 Mo. 539; Fiedler v.
Railroad, 107 Mo. 652; Guenther v. Railroad, 108 Mo.
18; Hanlon v. Railroad, 104 Mo. 389; Dunkman v. Rail-
road, 95 Mo. 232; Guenther v. Railroad, 95 Mo. 295;
Bergeman v. Railroad, 88 Mo. 678; Werner v. Railroad,
81 Mo. 374; Kelly v. Railroad, 75 Mo. 140; Frick v.
Railroad, 75 Mo. 595; Morrissey v. Wiggins Ferry Co.,
43 Mo. 383; Adams v. Wiggins Ferry Co., 27 Mo. 95.
This is the rule established in the Supreme Court of the
United States.  Inland, etc., Co., v. Tolson, 139 U. S.
551; Railroad v. Ives, 144 U. S. 408.  The doctrine
came to us from England where it has been announced
by courts and judges of the very highest authority.

Radley v. Railroad, L. R. 1 App. Cas. 759; Davies v. Mann, 10 M. & W. 546; Tuff v. Warman, 5 C. B. (N. S.) 573; Springett v. Ball, 4 F. & F. 472. (4) Even after Koons had been struck by the engine and knocked down, his life was not lost until he had been pushed along the plank crossing for thirty-one feet and along the rails east of the crossing for thirty to forty-five feet. During this time the engine was running slowly, only two or three miles per hour. It could have been stopped instantly, or in three to five feet. (Testimony of O'Neil; testimony of engineer.) The engineer had this notice of deceased's peril: (a) Schmitt and some persons at the saloon screamed almost immediately, Schmitt crying, "Stop!" as loud as he could. (b) Mrs. Schneider testified that Koons screamed just as the engine struck him, and several times afterwards. (c) Koons's hat and flag fell near the middle of Holmes street, on the north '(the engineer's) side of the engine. It was the engineer's duty to stop his engine and prevent Koons's death. Brook v. Railroad, 81 Iowa 514. (d) The engineer testified in his deposition that he first knew he had struck Koons when about half way across Holmes street, after he had run the length of his tank (35 feet). He also testified that his engine had been at rest nine to ten feet west of the shanty. This would put the engine fourteen to fifteen feet west of Holmes street, and was equivalent to a statement that he found out Koons's peril twenty to twenty-one feet east of the west line of Holmes street, so that he had twenty-eight to twenty-nine feet in which to stop his engine before passing the plank. While Koons' body was being shoved along the plank, it was not under the wheels, but was resting on the brake-beam. Under these undisputed facts, the engineer had actual knowledge of Koons's peril in time to have saved his life, and under all the authorities defendant is liable.

MARSHALL, J.—This is an action, under the statute, to recover five thousand dollars damages, for the death of the plaintiff's husband, caused by being run over and killed by one of the defendant's cars, on March 9, 1899, at Second and Holmes streets, in Kansas City. The plaintiff recovered a judgment below and the defendant appealed.

The petition alleges that the deceased was employed by the defendant as a flagman or watchman at Second and Holmes streets, and that he was killed while in the discharge of his duties, at said time and place.

The petition then charges that:

"The death of the said Edmond B. Koons was directly occasioned by the negligence, carelessness and want of ordinary prudence upon the part of the defendant, its servants and agents in the following re-spects, to-wit:

"1. Prior to said injury and death defendant had enacted and given all its servants notice of two rules governing the operation of its locomotive engines, which rules were applicable to the operation of said engine number sixty-seven, at said time and place, and were and are in words and figures as follows:

"'The engine bell must be rung before an engine is moved. . . . The engine bell must be rung for eighty rods before reaching every road crossing at grade, and until it is past. The whistle must be sounded as per rule.'

"Said engine immediately prior to said injury stood twenty to fifty feet west of Holmes street, and defendant's agents and servants in charge of said locomotive engine negligently and carelessly started and moved same over and across Holmes street in said city at said time without giving any signal whatever, and neither rang the bell nor sounded the whistle on said engine, so that said engine came upon the said Edmond B. Koons unawares and struck and killed him as here-

tofore stated.    That if said bell had been rung or whis-
tle sounded said Edmond B. Koons would have taken
warning, escaped from danger and all injury would
have been avoided.

"2.    The agents, servants and employees of de-
fendant operating said locomotive engine, knew, or by
the exercise of ordinary care might have known, that
Edmond B. Koons was, immediately prior to the move-
ment of said engine, upon the defendant's track in a po-
sition of peril, in front of said engine, in time to have
stopped or prevented the movement of said engine,
and to have avoided injuring said Koons, but said serv-
ants of defendant negligently failed and omitted so to
do and ran said engine over him as heretofore stated.

"3.    One of the servants of defendant named Par-
ish engaged in operating said engine passed down said
track east of said Koons and negligently and carelessly
signaled to the servants of defendant in charge of said
locomotive engine to move eastward, and said engine
was, in obedience to said signal, moved toward the east
when he, the said Parish, knew or by the exercise of or-
dinary care might have known that said Koons stood
on said track in front of said engine and in a position
of peril, but said Parish negligently failed to give said
Koons any signal or warning and negligently failed to
postpone the movement of said engine until said Koons
had passed out of danger, and although said Koons was
wholly ignorant of any intended movement of said en-
gine and could not have discovered the same by the
exercise of ordinary care, the same was started for-
ward, ran against, upon and over him, causing his
death as aforesaid.

"4.    Said engine struck Koons without injuring
him, and his body, resting against the brake beam of
said engine, was pushed along unharmed in front of the
same for a distance of seventy to eighty feet and said
Koons and bystanders and spectators were, during all
of said time, shouting, screaming to, and signaling the

servants of defendant operating said engine to stop the movement thereof and said servants in consequence of said shouts, screams and signals, knew or by the exercise of ordinary care might have known that said Edmond B. Koons was being shoved ahead of said engine and in a position of peril in time to have stopped said engine and prevented all injury to him, but they negligently and carelessly failed to do so and negligently ran said locomotive over him, and killed him as aforesaid.''

The answer is a general denial, and special pleas of contributory negligence and assumption of risk.

The case made is this:

The deceased had been in the employ of the defendant as flagman or watchman, at the intersection of Second and Holmes streets, for about three years before the accident. Second street is sixty feet wide and runs east and west, and Holmes street is fifty feet wide and runs north and south. The defendant has a double track, standard-gauge road on Second street. It was the duty of the deceased to look out for all cars and to watch the crossing and warn persons of the approach of cars. For two or three months the defendant had been engaged in taking earth out of a pit, which was located west of Holmes street, and which was reached by a switch track from the south track on Second street. Two engines, trains and crews were employed in the work. One engine, which was numbered 67, remained at the place all the time, and was engaged in taking the train of empty cars from the north track and switching it onto the south track, by means of a cross-over, which was located about twenty-five or thirty feet east of Holmes street, and then pushing the train westwardly along the south track to the switch track, and over the switch track to the pit, and when the cars were loaded, the same engine brought them back onto the south track and stopped with its tender at or near the west line of

Holmes street. The other engine which was numbered 61 was engaged in moving the loaded cars westwardly from Holmes street over the south track to the west bottoms, and when they were unloaded, that engine moved the empty cars eastwardly over the north track to Holmes street, and there it was stopped with its tender at or near the west line of Holmes street. The engines were attached to the rear of the trains, and were always faced towards the west. So that when engine number 67 pulled the loaded cars along the south track and stopped with its tender at or near the west line of Holmes street, and when engine number 61 brought the empty cars from the west bottoms eastwardly along the north track, and stopped with its tender at or near the west line of Holmes street, the two trains would be standing side by side. The two engines were then uncoupled from their trains. The engines were then switched so as to be exchanged from one train to the other. To accomplish this, it had been the uniform custom during all the time the work was progressing, for engine number 67 to back eastwardly across Holmes street to a point clear of the said cross-over, and there stop. Then engine number 61 would come back eastwardly, across Holmes street, to the cross-over, and thence across the cross-over from the north track to the south track, and then run forward westwardly across Holmes street to where the loaded cars had been left standing, and couple onto them, and push them westwardly along the south track to the west bottoms. Then as soon as engine number 61 had thus been exchanged from the empty cars on the north track to the loaded cars on the south track, and had moved westwardly over the south track, engine number 67 would proceed from the south track over the cross-over to the north track, move westwardly across Holmes street to where the empty cars had been left standing on the north track, couple onto them, and pull them eastwardly across Holmes street,

over the cross-over onto the south track, and then shove them westwardly along the south track, across Holmes street, to the switch track that was west of Holmes street, and over the switch track to the pit. This work went on constantly from six o'clock a. m. until six p. m. on every day for two or three months prior to the accident, during all which time the deceased had been acting as flagman at the crossing on Second and Holmes streets, and was familiar with the manner of doing the switching above described. Thus it will be observed that every time the exchange of engines aforesaid was made, engine number 67 crossed Holmes street four times, and engine number 61 crossed Holmes street twice. The engines were ordinary road engines, with square tenders, about twelve feet high.

The switchman had a little shanty about eight feet square and six or seven feet high, on the southwest corner of Second and Holmes streets and which projected about two feet and eight inches into Holmes street.

On March 9, 1899, about 4 o'clock p. m., engine number 67 had pulled a train of loaded cars from the pit, along the south track and stopped, with the rear of its tender resting about eight or ten feet west of the west line of Holmes street. It uncoupled from the cars as usual, and waited, some twenty-five minutes, the coming from the west on the north track, of engine number 61, with the empty cars. Then engine number 61 arrived on the north track, with the empty cars, and stopped with the rear of its tender about eight or ten feet west of the west line of Holmes street.

About this time, a citizen, M. J. Schmitt, appeared driving south on Holmes street towards the tracks. The deceased went out to a point about eighteen feet east of the west line of Holmes street to flag Schmitt. The deceased flagged Schmitt and he stopped at a point in Holmes street, about seventy to seventy-five feet north of the north track. About that time, engine 67

backed eastwardly across Holmes street, and while doing so it struck the deceased, knocked him down, and the brake beam caught him and dragged him the balance of the way across Holmes street, and to a point east of Holmes street, variously testified to be from twenty-five to forty-five feet east of the east line of Holmes street, when the engine was stopped, and the deceased was taken out from under the tender, so badly mangled and crushed that he died immediately.

The plaintiff introduced two eye-witnesses to the accident, M. J. Schmitt and Mrs. Elsie Schneider. Mr. Schmitt saw the accident from a point in Holmes street seventy or seventy-five feet north of the north track, and Mrs. Schneider saw it from the front porch of her house, which was two hundred and twenty-five feet east of the center line of Holmes street, and one hundred and twelve feet south of Second street, and which house stood upon an 'elevation of some twenty to twenty-five feet above the railroad tracks on Second street.

Schmitt testified that after the deceased flagged. him he stood still for about five minutes, or "a few minutes anyway." He further testified as follows:

"Q. What track did Mr. Koons stand in, if he was in either track? A. Why, the way I could see, I think he was standing inside of the first south rail.

"Q. You mean north of the first south rail? A. North of the first rail on the south track."

He further testified that at that time engine number 67 was standing still on the south track about eight or ten feet west of the west line of Holmes street, and that the deceased was so standing between the rails of the south track, at a point in Holmes street, about eighteen feet east of the west line of Holmes street; that engine number 67 then moved eastwardly on the south track and struck the deceased. That he paid no particular attention to it, but heard no bell rung or whistle sounded, but noticed a slight sound made by the escape of steam from the piston rod on the engine; that

when the engine struck the deceased he (Schmitt) was paralyzed with fear for a moment, and then he halloed to stop the engine, and that some persons at the saloon on the corner also screamed, but he could not say whether the engineer heard the sound; that at the time the engine was moving slowly, about two or three miles an hour, and the deceased had been dragged about ten feet; that on account of the sun shining on the cab windows, he could not see any one in the engine.

On cross-examination he was asked:

"Q. He was standing about the middle of the street? A. After he was struck?

"Q. No, I mean before he was struck; at the time he was signaling to you? Did you see where he stood then? A. I could not say exactly, but my impression was since, he was standing inside the south rail.

"Q. Inside the south rail? A. Inside the south rail.

"Q. Do you mean he was standing on the track between the two rails? A. Well between the inside— I could not state exactly at that distance, but I think by the way he was caught on the brakebeam he was standing inside the south rail, if he was near the center of the rail or where I could not say.

"Q. Of the south rail, you mean the south track? A. The south rail of the south track. There were two rails to the track, and he was inside the south rail; that is the way it appeared to me he was standing at the time he was struck."

Schmitt further testified that he had passed there before and that the deceased usually stood south of the outside of the track, when he was flagging.

He further testified:

"Q. Did you watch the engine as it moved toward Mr. Koons? A. Well, I looked at the cab, I kind of noticed the engine. But I was not positive then the old gentleman was standing on the the track before he was

struck, or standing on the outside of it. I never paid any particular attention to it at that time.

"Q. You assumed he would get off if he was on the track? A. That he would go away in case he was; I was not paying any attention to that."

Mrs. Elsie Schneider, the other eye-witness, who testified for the plaintiff, said:

"Q. Did Mr. Koons stand in one of the tracks of the defendant? A. Well, he stood not in the tracks, he stood on Holmes street, but he made a step over to flag a wagon that came from the north side when it happened."

She also said that when the engine struck the de-deceased, she heard him scream several times, but did not hear any one else scream.

On cross-examination, she said that she had noticed the deceased flagging before that day, and that he never stood "right in the track when the train came. He stood on the side of the track when he flagged." She also said that just before the accident, the deceased had been talking to two colored women on the corner. She further testified as follows:

"Q. When the engine started up, did you see it start? A. Yes, sir.

"Q. You saw it approach Mr. Koons? A. Yes, sir.

"Q. When the engine started up and approached Mr. Koons, where was he standing? A. He was standin the middle of the street there, and a wagon was coming from the north, and he wanted to flag that wagon not to come over; and he just made a step to flag that wagon, and I guess he stepped a little too far on the track, and there is where it struck him.

"Q. How far was he standing from the track when he started to flag? A. Right by the track.

"Q. He was standing right by the side of the track? A. Yes, sir.

"Q. About that time the engine began to pull along? A. Yes, sir.

"Q. When the engine was moving up towards him, he stepped over on the track? A. Yes, sir.

"Q. And the engine struck him? A. Yes, sir; because the wagon was coming from the other side; he wanted to flag that wagon, and he stepped—

"Q. (Interrupting): In other words, just before the engine came to him, he stepped on the track in front of the tender? A. Yes, sir."

She further testified that when the engine moved towards the deceased, there was a bell ringing, but she could not tell which engine the bell was on.

It was further shown by the plaintiff's evidence that an engine running from two to four miles an hour, could be stopped at that place, in five or six feet after the engineer got a signal to stop and after he got his hands on the lever.

For the defendant the engineer of number 67 testified to the custom herein described of handling the trains and exchanging the engines, and said that his engine invariably moved across Holmes street, first. He said further that he and his fireman were in the cab of the engine. He was on the north side and the fireman on the south side. That after number 61 came from the west with the empty cars and stopped opposite his engine, west of Holmes street, the head switchman, whose duty it was to direct the movements of the trains, went east of Holmes street towards the switch, and signaled to him to move eastwardly; that he immediately caused the fireman to ring the bell, and looked eastwardly and saw that the track was clear, and then he moved his engine eastwardly; that he had seen the deceased about five minutes before, standing on the north side of Second street talking to a policeman; that he did not see him just as the engine moved, and did not look for him specially because it was the duty of the deceased to look out for all cars and en-

gines, and to keep other people off the crossing as they approached, and likewise to keep off the tracks himself; that he was the "guardian of the crossing," and it was his duty to look out for the trains and not the engineer's duty to look out for him; that trains could not be operated if engineers had to look out for the flagmen at crossings before starting their trains; that he was looking eastwardly all the time after he started the engine and did not see the deceased at all; that he heard no shouts or screams, and did not know that Koons had been knocked down and was being dragged under the tender; that he saw a young man named Mahoney, who was standing on the northeast corner of Second and Holmes streets, waving his hands for him to stop, and pointing under the tender, and he then stopped immediately, supposing something was wrong, and the fireman got down and looked under the tender, and told him that Koons was under the tender, and that this was the first he knew of Koons being there, and that he stopped the engine at about sixteen feet from the end of the board crossing; that is, the tank was about thirty-five feet long, and the engine was at the crossing, but the tender was east of the crossing; that the engine only ran forty-eight feet and five inches from the time it started until it stopped.

He further testified that a stop in ten or fifteen feet when the engine is running at three or four miles an hour, is a good stop.

He further testified that when he was sitting on his seat in the cab of the engine, he could not see a man on the track "for quite a ways back of the tank," and that standing up in the cab, he could not see one who was fifteen or twenty feet behind the tender, but could see him if he was thirty-five feet, and possibly if he was twenty-five feet behind the tender.

There was shown to be some differences between the testimony of the engineer at the trial and when his deposition was taken, but he explained that when his

deposition was taken, his wife had just died, and he was in a sad condition, and that his testimony was not as clear or accurate then as it was on the trial, and that since his deposition had been taken, he had measured the distances accurately.

The fireman corroborated the engineer's testimony, in all particulars, except that he said he was not certain that engine 67 invariably moved eastwardly first.

At the close of the plaintiff's case and again at the close of the whole case, the defendant demurred to the evidence, the court overruled the demurrers, and the defendant excepted. The case was tried below by the plaintiff, and was submitted to the jury, on the theory that the deceased was in a place of imminent peril, to-wit, standing between the rails of the south track, and was engrossed in the discharge of his duty, and was oblivious to his danger, or risked his life to save that of others, and that the defendant actually knew of his peril, or by the exercise of ordinary care could have known of it, and either by a willful, wanton and reckless disregard of human life, or intentionally, ran over him and killed him, and therefore the defendant is liable, notwithstanding, as the plaintiff's instruction put it, "the husband of the plaintiff was himself guilty of negligence in being upon or near the track of defendant, and in permitting himself to be inattentive to the dangers surrounding him."

## I.

The plaintiff predicates a right to recover upon what is known as the humanitarian doctrine, that is, that where the defendant has been guilty of negligence and the plaintiff has been guilty of contributory negligence, still the plaintiff can recover if after the defendant actually knows, or by the exercise of ordinary care could have known, of the peril of the plaintiff, he willfully, wantonly or recklessly injures the plaintiff.

The plaintiff invokes the law as laid down in this State in Kellny v. Railroad, 101 Mo. 1. c. 75, and in Morgan v. Railroad, 159 Mo. 262, and claims that it is based upon the English case of Davies v. Mann, 10 M. & W. 546, which plaintiff says holds that even if both parties have been negligent, the defendant has no right to be guilty of a willful, wanton or reckless disregard of human life and injure the plaintiff. The plaintiff also invokes the rule laid down in Callahan v. Railroad, 170 Mo. 473, and that stated in Beach on Contributory Negligence (3 Ed.), sec. 42, that it is not deemed negligence in law if one risks his life or exposes himself to danger in an effort to save the life of another, or to protect another who is exposed to sudden danger.

The plaintiff also contends that when the engine was started the deceased was standing between the rails of the south track at a point eighteen feet east of the west line of Holmes street, and the engine was at a point ten feet west of the west line of Holmes street, and that the engineer could see any one who was standing on the track twenty-five feet behind the engine, and therefore the deceased was within the "zone of vision" of the engineer, and hence the engineer saw, or by the exercise of ordinary care could have seen, the deceased in a position of imminent peril in time to have stopped the engine before striking the deceased, and failed to do so.

The plaintiff further contends that after the engine struck the deceased and knocked him down, and was dragging him, and before any particular injury had been inflicted upon him, the engineer knew or by the exercise of ordinary care could have known of the position of peril of the deceased, and could have stopped the engine in time to avoid seriously hurting him, but that instead of so doing, the engineer either willfully, wantonly and recklessly, or intentionally, continued to run the engine, and did not stop it until fatal injuries had been inflicted upon the deceased.

The humanitarian doctrine in this State is as the plaintiff states it, but it is not necessary in this' case for the writer hereof to reiterate what he has often heretofore said with respect to the rule thus announced being incomplete and unilateral, for the reason that it omits to take into account the correlative obligation of the plaintiff not to be guilty of willful, wanton or reckless conduct after he actually knew or by the exercise of ordinary care could have known, of his peril in time to avert the injury.  Neither is it necessary in this case to say more than that in the opinion of the writer the case of Davies v. Mann, supra, does not support the humanitarian rule as it is now stated in this State, and elsewhere, for the reason that in that case the plaintiff had tethered his donkey and left him to feed on the highway, and the defendant's servant came along the highway with the defendant's wagon and instead of being on the wagon and managing the team, he was walking some distance behind the wagon and was allowing the horses to proceed uncontrolled along the highway, and they ran into the donkey, who being tethered could not get out of 'the way, and killed him. Lord Erskine told the jury, "That though the act of the plaintiff in leaving the donkey on the highway so fettered as to prevent his getting out of the way of carriages traveling along it, might be illegal, still, if the proximate cause of the injury was attributable to the want of proper conduct on the part of the driver of the wagon, the action was maintainable against the defendant; and his lordship directed them, if they thought the accident might have been avoided by the exercise of ordinary care on the part of the driver, to find for the plaintiff." The jury found for the plaintiff and the case went to the Court of Exchequer, where the judgment was affirmed, and wherein the opinions were as follows:

"Lord ABINGER, C. B. I am of the opinion that there ought to be no rule in this case. The defendant has not denied that the ass was lawfully in the highway, and therefore we must assume it to have been lawfully there; but even were it otherwise, it would have made no difference, for as the defendant might, by proper care, have avoided injuring the animal, and did not, he is liable for the consequences of his negligence, though the animal may have been improperly there.

"PARKE, B. This subject was fully considered by this court in the case of Bridge v. The Grand Junction Railway Company, 3 M. & W. 246, where, as appears to me, the correct rule is laid down concerning negligence, namely, that the negligence which is to preclude a plaintiff from recovering in an action of this nature, must be such as that he could, by ordinary care, have avoided the consequences of the defendant's negligence. I am reported to have said in that case, and I believe quite correctly, that 'the rule of law is laid down with perfect correctness in the case of Butterfield v. Forrester (11 East 60), that, although there may have been negligence on the part of the plaintiff, yet unless he might, by the exercise of ordinary care, have avoided the consequences of the defendant's negligence, he is entitled to recover; if by ordinary care he might have avoided them, he is the author of his own wrong.' In that case of Bridge v. Grand Junction Railway Company, there was a plea imputing negligence on both sides; here it is otherwise; and the judge simply told the jury, that the mere fact of negligence on the part of the plaintiff in leaving his donkey on the public highway, was no answer to the action, unless the donkey's being there was the immediate cause of the injury; and that, if they were of the opinion that it was caused by the fault of the defendant's servant in driving too fast, or, which is the same thing, at a smartish pace, the mere fact of putting the ass upon the road would not bar the plaintiff of his action. All

that is perfectly correct; for, although the ass may have been wrongfully there, still the defendant was bound to go along the road at such a pace as would be likely to prevent mischief. Were this not so, a man might justify the driving over goods left on a public highway, or even over a man lying asleep there, or the purposely running against a carriage going on the wrong side of the road.

"GURNEY, B., and ROLFE, B., concur.

"Rule refused."

The writer hereof has always been unable to understand how this case can be said to afford a basis for the rule that holds the defendant liable for willful, wanton and reckless conduct, but does not make the plaintiff liable for similar conduct. For that case only entitles the plaintiff to recover if the defendant's negligence be such that the plaintiff by ordinary care could not have been avoided being injured. In that case the donkey was fettered so he could not get out of the way, wherein that case differs from the case at bar, for here the flagman could have gotten out of the way. And in that case the illustrations given by PARKE, B., were of driving over goods left on a public highway, or over a man asleep on the highway, or purposely running against a carriage going on the wrong side of the road, and therefore, were cases where the thing or person injured could not avoid the defendant's negligence or wantonness, and could not themselves have been guilty of willfulness or wantonness or recklessness.

But it is not necessary to pursue that matter further now, for whatever differences of opinion there may be, still, under any rule that has ever been laid down on this branch of the law, the facts in this case do not bring the case within the rule, and, therefore, the plaintiff can not recover.

This case is wholly unlike the Morgan case or the Callahan case relied on by the plaintiff, and is easily

distinguishable from the case of Erickson v. Railroad, 171 Mo. 647. It is unlike the Morgan case, because there the injured party was a citizen and not an employee, while here the injured party was a flagman whose duty it was to lookout for all cars and to warn all people to keep out of danger, and to keep out of danger himself. It is unlike the Callahan case, because there the injured party had a right to rely upon it from the previous manner of doing business that the section gang would not throw the ties down from the bridge onto the street until he told them the coast was clear, and because he necessarily exposed himself to the danger to save a child, while here the deceased was perfectly aware of the fact, from the previous manner of doing business, that as soon as engine number 61 came from the west with the empty cars, engine 67 would cross back across Holmes street and knowing this, he was actually engaged in flagging Schmitt against the approach of engine 67, and in so doing, it was not at all necessary for him to expose himself to danger or to risk his life by standing on the track, as this duty had always theretofore been safely performed by standing outside of the track, and because, according to Schmitt's testimony, he never was at any time in danger, having stopped seventy or seventy-five feet north of the north track.

This case is also unlike the Erickson case in that there the flagman had a number of trains to watch, and was actually engrossed in flagging a street car against a train on another track that was about to back across the crossing, and was injured by an engine on a track closer to him which he did not know was coming and had no reason to expect, while here the deceased had only these two engines to look out for, and from the previous manner of doing business, he knew the engine that did this hurt, number 67, would back across Holmes street first, and he was then actually flagging Schmitt against this engine.

As stated, the facts in this case do not bring the case within any of the cases or rules above referred to or cited and relied on by the plaintiff.

It will be remembered that the plaintiff's theory is that the plaintiff is entitled to recover because notwithstanding the negligence of the deceased in standing on the track, the defendant actually knew, or by the exercise of ordinary care could have known, that the deceased was in imminent peril in time to have averted the injury and did not do so, and that the plaintiff's application of this doctrine to this case is, that the deceased could have been seen by the engineer standing on the track before he moved his engine, and that even if this is not true, the engineer knew the peril of the deceased after he was knocked down, and while he was being dragged, and before he was seriously hurt, in time to have stopped the engine and to have averted the injury, and failed to do so.

Upon the first branch of this proposition, the plaintiff contends that the deceased was standing on the track at a point in Second street, eighteen feet east of the west line of Holmes street; that the engine was standing ten feet west of the west line of Holmes street; that the "zone of vision" of the engineer was twenty-five feet behind the tender, and, therefore, the deceased was within sight of the engineer, and his peril was known or could have been known by the exercise of ordinary care, to the engineer, in time to have averted the injury.

The evidence shows that the rear of the tender of the engine was standing eight or ten feet west of the west line of Holmes street, and that the deceased was standing about eighteen feet east of the west line of Holmes street, but right there there is a fatal break in the plaintiffs' chain of causation, for instead of the evidence showing that the deceased was standing between the rails of the south track, there is no substantial evidence that such was the fact, but on the contrary, the only real evidence, the only testimony in the case that

is worthy of the name of evidence, is that the deceased was not standing on the track, but was standing in a perfectly safe place, and in the place at which he usually stood, until the engine had started to back across Holmes street, and was approaching the deceased, and when the engine had gotten so close to him that the engineer could not see him "he just made a step to flag that wagon, and I guess he stepped a little too far on the track, and there is where it struck him," as Mrs. Schneider, the plaintiff's eye-witness, described it.

This is what Mrs. Schneider said was the cause of the injury, and she is the only witness in the case who speaks advisedly or accurately or as a fact, as to how the unfortunate accident occurred.

It is true that the plaintiff relies upon the testimony of Schmitt as furnishing a basis in fact for the contention. But an analysis of Schmitt's testimony shows that he did not pretend to speak advisedly or accurately upon this point, and that what he said is plainly an argument or conclusion of his own, and not a fact of which he can, or pretends to, speak. He says he paid no particular attention, at the time, to where the deceased was standing, but he first said he "thought" the deceased was standing on the track, then he said he could not say exactly where he stood but his "impression was *since*" that he was standing inside of the south rail, and then he said, "it appeared to me" he was standing on the track "at the time he was struck," and finally he said, "I think by the way he was caught on the brake-beam he was standing on the inside of the south rail, if he was near the center of the rail or where I could not say."

Thus it will be observed that after saying he paid no attention to it at the time "his impression since the accident" is, and he "thinks," now, that the deceased was standing on the track, and he winds up his testimony by saying he "thinks" "by the way he was

caught by the brake-beam he was standing inside the south rail.''

This is not testimony of a fact which the witness knows, but is simply the opinion or impression of the witness formed since the accident, or it is his deduction drawn from the fact that the deceased was caught by the brake-beam. Of course, the witness was on the track when he was struck, else he would never have been injured. But when did he get on the track—before the engine came so near him that the engineer could see his peril, or afterwards? That is the pivotal question underlying the plaintiff's right to recover, and conceding all that Schmitt says, and giving all legal weight to his testimony, it wholly fails to afford a substantial basis for the plaintiff's case to rest upon, or to make out a case to go to the jury upon.

This leaves only the testimony of plaintiff's other eye-witness, Mrs. Schneider, and she says that the deceased was not on the track at all until the engine started to move nor until the engine approached the deceased, and then he took a step and went too far and was struck. This positive testimony is not only uncontradicted, but it is the only real testimony in the case as to the position of the flagman before the engine started to move, and as to when he got on the track, and this testimony leaves no room for reasonable minds to differ that at the time the plaintiff got into a position of peril he was so close to the tender that the engineer could not see him, and therefore the humanitarian doctrine has no place in this case, for there is absolutely no evidence of willfulness, wantonness or recklessness or of intention to injure the flagman shown, and hence the plaintiff is not entitled to recover. [Moore v. Railroad, 176 Mo. 528.]

Touching the second branch of the proposition, that the engineer knew or by the exercise of ordinary care could have known that the deceased was being dragged in time to have avoided seriously injuring him,

the testimony of Schmitt is that he halloed and some persons on the corner screamed while the deceased was being dragged, and before he was seriously injured, but he also said he could not say whether the engineer heard him or them or not, while the engineer and fireman both say the bell was being rung on engine number 67, and Mrs. Schneider says a bell was ringing, but she could not say whether it was on engine 61 or 67 (it must have been on 67, for 61 was standing still at the time) and Schmitt says the steam escaping from the engine was making a noise, and both the engineer and fireman say they did not know that the flagman had been knocked down, or was being dragged or was under the tender, until the engineer stopped the engine because of the signals given by the young man Mahoney, who was standing on the northeast corner of the streets aforesaid and because he was pointing down at the tender, and he supposed there was something wrong.

Upon such a state of facts, it would not be fair or just or reasonable to find that the engineer knew the flagman was being dragged and willfully, wantonly, recklessly or intentionally failed to stop the engine. The engineer was sitting on the bench in the cab of the engine, looking eastwardly; his "zone of vision" of the track began at a point twenty-five feet behind the tender. Admittedly, there were only twenty-eight feet between the rear of the tender and the place in Holmes street where the deceased stood, and at that time the deceased was not standing on the track. When the train had moved three or four feet it was not possible for the engineer to see the deceased. At some time after the engine began to move, the deceased unguardedly stepped out on the track. The engineer did not and could not see him. He was knocked down and dragged from forty-eight feet five inches, as the engineer testi-fied, to about seventy to seventy-five feet, as some of the witnesses put it, but the engineer did not know it until after the engine was stopped and the fireman got down

and looked under the tender and saw the deceased and told the engineer.

The engineer was an old and experienced man, had never injured any one before, and had no feeling against the deceased, and no desire or intention to injure him. The accident was unfortunate, but there is no element of willfulness or wantonness or recklessness or intentional wrong in the case. The diligence of counsel has supplied a great many cases of flagmen being injured, in some of which recoveries have been permitted, and in others denied, but it will serve no good purpose to analyze them in this case.

The instruction for a nonsuit should have been given. The plaintiff made out no case, and the judgment is reversed. *Robinson, J.,* concurs; *Brace, P. J.,* concurs in the result; *Valliant, J.,* concurs in all except what is said in criticism of Kellny. v. Railroad.